**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 13** |
| | ) | |
| **HERBERT SHERMAN TAYLOR** | ) | **Case No. 09-72532** |
| **LILLIAN MARIE TAYLOR,** | ) | |
| | ) | |
| **Debtors.** | ) | |

_____

## <u>MEMORANDUM DECISION</u>

The matter before the Court concerns the Chapter 13 Trustee's ("Trustee")

Objection to Confirmation and Motion to Dismiss the Debtors' case with prejudice (the

"Motion"), filed on November 16, 2009, pursuant to §§ 1325(a)(3), 1325(a)(6), and 1307 of the

Bankruptcy Code.  Following a hearing before the Court on December 7, 2009, at which time the

male debtor testified, the Court took the matter under advisement, allowing the Debtors ten days

to provide a written analysis setting forth the plausibility of achieving confirmation of a Chapter

13 plan and eventual completion of their case.  Based upon the following findings of fact and

conclusions of law, the Court will grant the Trustee's Motion to the extent set forth in the

opinion below.


**FINDINGS OF FACT**

I.  Present Case

The Debtors filed a voluntary Chapter 13 petition on October 2, 2009.  In their

originally filed and subsequently amended schedules[1] the Debtors list one real property asset

_____

[1] Schedules D, I, and J were amended following the original filing of schedules on
October 19, 2009.

with a value of $117,600 located in Roanoke, Virginia, encumbered by a Deed of Trust in favor

of American Home Mortgage Service[2] securing an indebtedness scheduled at $111,219.46.  Two

other secured debts identified in the Debtors' schedules are a judgment against the Debtors for

$90 for services provided by a dentist in Roanoke and an indebtedness to Regional Acceptance

Corporation of $11,559 secured by the Debtors' automobile, a 2002 Dodge Neon valued at

$4,600.  In Schedule E the Debtors list one priority claim of the Internal Revenue Service for

$200.  In Schedule F the Debtors list various unsecured debts, a number of which are for medical

expenses, payday loans, unsecured judgments, and credit cards, with the total amount of

unsecured debt listed as $38,368.61.

On October 19, 2009, the Debtors filed their first Chapter 13 plan in the present

case which set forth a proposed funding of $550 per month for sixty months.  Under this plan the

Debtors proposed a payment of 10% on unsecured debt of $36,368.61, an amount which is

$2,000 less than what was listed in Schedule F.  The Debtors also proposed to modify the claim

of Regional Acceptance Corporation by a valuation of their Dodge Neon at $4,600 and to pay

such creditor's secured claim with interest at a rate of 6.5% per annum in twelve monthly

payments of $396.96 each.   With respect to the treatment of the secured claim of American

Home Mortgage Service, the Debtors proposed to pay American Home Mortgage Service

directly with payments of $976.10 per month, leaving the Trustee to make payments on the

arrearage of approximately $20,928.52.[3]

---

[2] The Debtors refer to the mortgage company as "American Home Mortgage Service."

[3] The monthly payment amount and the amount of arrearage correlate exactly with the
figures contained in Exhibit A to the Proof of Claim filed by American Home Mortgage
Servicing in this case.  The arrearage amount is indicated to be comprised of nineteen missed

Following the filing of their plan, the Trustee filed her Motion seeking dismissal of the Debtors' case.  In the Motion the Trustee alleges that the Debtors (1) have not filed their petition in good faith, (2) have not demonstrated willingness or ability to perform, (3) increased their mortgage arrearage during the last case, (4) have had two prior bankruptcy cases dismissed within the previous year, (5) made erroneous representations in the last case that payments had been made when that was not the case, (6) failed to make timely plan payments and house payments in the last case, and (7) modified plans to forgive defaults and only made payments on the eve of, or following, court hearings on motions to dismiss.  The Trustee therefore contends on the basis of these allegations that the Debtors have demonstrated delay that is prejudicial to creditors and disregard for the requirements of the Bankruptcy Code to make regular and timely payments, which warrants dismissal.

At a confirmation hearing before the Court on December 7, 2009, the Debtors, counsel for the Debtors, and the Trustee appeared.  At that hearing counsel for the Debtors represented to the Court that the Debtors had brought their December plan payment and house payment with them to the hearing to turn over to the Trustee.  Counsel then requested a continuance in order to file a new plan within fourteen days and to have time to resolve the issues set forth in the Trustee's Motion.  At that time, however, the Trustee stated to the Court that she would not consent to a continuance and requested the opportunity to prosecute her

---

monthly payments of principal and interest of $741.95 each, attorneys' fees and costs of $1,236 (net after partial recovery), inspection fees of $325.65, appraisal fees of $220, and escrow shortage of $5,049.82.  The current monthly payment indicated to be $976.10 appears to include escrow payments for insurance and real estate tax expense.  The arrearage claimed included the mortgage payment for October, 2009, the petition filing occurring on the second day of that month.

3

Motion.  Following the statements of counsel, Mr. Taylor testified.

Initially Mr. Taylor testified concerning the Debtors' bankruptcy history.  The Debtors have filed bankruptcy on three separate occasions.[4]  Mr. Taylor testified that the motivation for the Debtors' first filing was their inability to make payments on their secured debts.  Mr. Taylor testified that their reason for filing the second case was on account of the Debtors' business slowing down.  Although Mr. Taylor testified that he hasn't been in that business for almost a year, he did testify that he performs casual labor to produce additional income.[5]  Mr. Taylor testified that the motive for the present filing was so the Debtors would not lose what was accomplished in the prior cases.

Following Mr. Taylor's testimony concerning the Debtors' prior cases, Mr. Taylor's testimony then concerned the circumstances of the Debtors' current financial situation.  In addition to the income received from social security, Mr. Taylor testified that he receives income for cleaning churches and automobiles.  Although Mr. Taylor testified that it has been approximately a month since he last cleaned a church or automobile, he did testify that in the last six months he had cleaned five or six automobiles and one church.  Mr. Taylor likewise testified that in the prior year he had performed approximately a dozen or more similar tasks.  However, Mr. Taylor testified that this casual labor had slowed recently, which he attributed to the national

---

[4] Although the record is quite clear that the Debtors have filed bankruptcy in this Court on three separate occasions, the petition originally filed in the present case omitted the Debtors' 2005 filing.  That petition was amended on December 7, 2009 after the Trustee had filed her Motion.

[5] Amended Schedule I filed in the present case indicates that the Debtors are both retired and receive their primary income from the Social Security Administration, but the first Schedule I filed in the Debtors' 2005 case indicates that the Debtors were both at one time self-employed at Taylor's Auto Care in Roanoke over a period of approximately twelve or more years.

4

economy.

The Trustee then questioned Mr. Taylor about this additional income.  Mr. Taylor

conceded that the Debtors had failed to include that income in their schedules.[6]  Mr. Taylor

testified that this money was not placed in a bank account because it was expended for utilities,

clothing, or food.  Mr. Taylor testified that the Debtors did not expend any of this income for the

benefit of the mortgage company since those payments are made separately by check.

The Trustee then questioned Mr. Taylor about the Debtors' obligations to the

mortgage company and the Trustee for their Chapter 13 plan.  Mr. Taylor testified that the

Debtors were in default with respect to those payments and when asked why those payments had

not been made, Mr. Taylor testified that the Debtors had decided to bring the payments to their

counsel rather than send them in.  Mr. Taylor did not explain the Debtors' rationale for this

rather than simply sending payment to the Trustee when it was due but testified that he

understood the Trustee payment was due on the first of every month and the mortgage payment

was due on the sixteenth of each month.  Mr. Taylor testified that the November mortgage

payment was not made because he had not received the income necessary to pay it when it was

due.  He was not asked to reconcile the Debtors' failure to pay their post-petition November

mortgage payment with the fact that they had filed their Chapter 13 plan in this case on October

19 in which they had committed to make direct payment of their obligation to American Home

Mortgage Servicing at the rate of $976.10 per month.

---

[6] The original Schedule I filed in the present case lists no additional income for
performing such services as cleaning churches or automobiles.  However, the amended Schedule
I filed with the Court on December 17, 2009, identifies an additional $75 per month in income
for "Casual Labor-estimated."

When asked about the Debtors' ability to make their mortgage and plan payments going forward, Mr. Taylor testified that he receives approximately $882 on the third of each month and his wife receives her income from the Social Security Administration on the third Wednesday of each month.  Although Mr. Taylor acknowledged that his wife receives somewhere in the range of $400 per month and combined with his income this amount is not enough to satisfy the Trustee payment of $550 per month and house payment of over $800 per month, Mr. Taylor did testify that the Debtors also receive checks for their grandchildren's  care and living expenses that provide additional income for making their payments.  Mr. Taylor specifically referred to his granddaughter but according to the statements of counsel and the Debtors' schedules, the Debtors currently have custody, either temporary or permanent, of two grandchildren, a fourteen year old girl and a six year old boy, though they are referred to as daughter and son in the Debtors' schedules.  Mr. Taylor also testified that his wife's brother lives with them and his wife's brother receives a social security check which he contributes to assist with the household expenses.  Although Mr. Taylor testified that these various sources of income are received at the earliest on the third of each month, Mr. Taylor testified that the income is sufficient for making both the Trustee and mortgage payments and Mr. Taylor testified that the Debtors intend to do so.  Mr. Taylor acknowledged his understanding that if the payments are not made, the Debtors' case will be dismissed.

Finally, Mr. Taylor was questioned about any communications he may have had with his mortgage company.  Mr. Taylor testified that he had made regular contact with the company to update them on the status of the bankruptcy case, but that no "workouts" were being negotiated.  Although Mr. Taylor indicated that the mortgage company may be willing to reduce

the payments, no explanation or other evidence was offered with respect to this representation.

Mr. Taylor testified that the current payment is $863 per month.  Although this may well have

been an accurate reflection of his understanding, both the mortgagee's proof of claim and the

Debtors' own plan reflect a current monthly payment of $976.10.

Following Mr. Taylor's testimony, the Trustee requested the Court to take judicial

notice of the Debtors' prior cases.  Those matters are Case Number 08-71819 filed in this Court

on September 18, 2008, and Case Number 05-74099, which was also filed in this Court on

October 3, 2005.

II.  Prior Bankruptcies

At the time of the Debtors' first bankruptcy filing in 2005, the Debtors listed in

Schedule A what appears to be the same residential property listed in Schedule A in the present

case.  At that time, the Debtors listed a value of $99,600 for the property and identified an

amount of $98,500 for the secured claim.  Per Schedule D, the secured claims identified were a

claim of $500 for a cash advance auto loan, a claim of $500 secured by a purchase money

security interest in the Debtors' television, a claim of $2,913 secured by a purchase money

security interest in the Debtors' wedding rings, a claim of $10,000 secured by the Debtors' 2002

Dodge Neon, and the mortgage previously identified, which at that time was held by Option One

Mortgage.  In Schedule F the Debtors listed $28,567.41 in unsecured debt.  No priority claims

were identified.  In their Schedules I and J the Debtors reported income of $2,653 and expenses

of $2,354, which left an excess of monthly income of $299.

In their first bankruptcy the Debtors filed a proposed plan with their petition.

Following this filing, the Trustee filed her 341 Report, after which a series of amended plans

7

were filed.  The Debtors first amended their plan on January 3, 2006, followed by a second

amended plan on February 18, 2006, which was confirmed on April 27, 2006.  A third

amendment was made on December 1, 2006, followed by a fourth on February 13, 2007.  In

these two post-confirmation amendments the Debtors stated that amendments were necessary

due to the female debtor being out of work because of an arm injury.  On March 26, 2007, the

Trustee filed an objection to confirmation setting forth as grounds that the Debtors were

delinquent in payments under their confirmed plan.  On April 24, 2007, the Trustee's objection

was withdrawn and the plan before the Court at that time confirmed.  However, on May 9, 2007,

the Debtors again amended their plan, a fifth time, stating similar grounds as before and noting

that the female debtor's injury would require surgery.  In this fifth amendment the May and June

2007 mortgage payments were provided for in the plan.

Following the filing of the fifth amendment, the Trustee filed a renewed objection

to confirmation, citing as grounds that the Debtors were delinquent in their plan payments.  A

few days after the Trustee filed this objection, the Debtors made a sixth amendment to their plan

stating that surgery was scheduled for the female debtor in August.  This sixth amendment also

brought the mortgage payments for July and August 2007 into the plan.  Following the sixth

amendment, Option One filed its own objection to confirmation.  In the objection Option One

alleged that over a twenty-two month period, the Debtors had only made nine payments on

account of the mortgage debt.  This objection also referenced the Trustee's objection on the

ground that the Debtors were likewise delinquent with respect to plan payments.  Ultimately the

objections of the Trustee and Option One were resolved after a series of continuances.

The objection of Option One was resolved by a consent order and the sixth

amended plan confirmed by the Court on December 20, 2007.  However, approximately a month

after, Option One filed a Notice of Default which represented that the mortgage payments for

October, November, December, and January had not been made.  This notice was thereafter

resolved and Option One withdrew the Notice of Default on March 27, 2008 after the Debtors

filed a seventh amended plan which provided for a suspension in payments due to the temporary

loss of a job contract.  Although this seventh amended plan was confirmed on May 14, 2008, a

Trustee's Motion to Dismiss was filed on July 22, 2008, citing as grounds a delinquency of

$2,524.  On September 9, 2008, the Court heard the Trustee's Motion to Dismiss and granted it

by Order entered the same day.

　　　　　Only nine days after the Debtors' first bankruptcy was dismissed, a new petition

was filed with the Court on September 18, 2008.  In their schedules the Debtors listed an

increased value of $117,600[7] for their residence and also listed an increased amount owed on the

secured claim on the real property, $112,000.  Per Schedule F the Debtors also listed a higher

amount of unsecured debt, $38,485.61.  Per Schedule D, the only secured claims listed as

remaining were the mortgage debt and the amount due on the 2002 Dodge Neon.  An additional

secured claim for the judgment in favor of the Roanoke dentist was added.

　　　　　On October 3, 2008, the first plan was filed and the Trustee filed a 341 report

shortly thereafter noting that the recent case had been dismissed because the Debtors had been

delinquent in making plan payments and that the income history didn't support the Debtors'

---

[7] This apparently reflected an increase in the property's assessed value for tax purposes.

9

ability to fund a plan. On October 24, 2008, American Home Mortgage Servicing[8] filed an

objection to confirmation, citing as grounds that the Debtors had provided for an arrearage of

only $4,400 in their proposed plan although the actual amount of the arrearage due was

$17,080.34. On November 10, 2008, confirmation of the proposed plan was denied with leave

for the Debtors to file an amended plan, which they did on November 21, 2008, which led to a

withdrawal of the objection by American Home Mortgage Servicing when the Debtors provided

for the arrearage as stated in the objection.

On December 22, 2008, a confirmation hearing occurred concerning the first

amended plan at which time counsel for the Debtors and the Trustee agreed to continue the

matter to January 12, 2009 with the possibility that the Trustee could tender a confirmation order

prior to the hearing. However, no confirmation order was tendered and the matter again was

heard on January 12, 2009, at which time counsel for the Debtors and the Trustee agreed to

continue the matter once again to January 26, 2009, with two remaining issues to be resolved.

However, prior to the January 26, 2009 hearing, American Home Mortgage Servicing filed a

Motion for Relief. The confirmation hearing set for January 26, 2009 was then continued over to

the same date and time as the hearing on the Motion for Relief. At that hearing it was

represented to the Court that the Motion for Relief would soon be withdrawn and the Trustee

agreed to confirmation once that occurred. On March 9, 2009 the Motion for Relief was

withdrawn and the confirmation order on the first amended plan entered the next day.

Approximately two months after confirmation of the first amended plan in the

---

[8] Pursuant to a Notice of Transfer filed with the Court in the Debtors' first bankruptcy,
Option One Mortgage transferred its claim to American Home Mortgage Servicing, Inc. on July
1, 2008.

Debtors' second bankruptcy case, a second amended plan was filed on May 5, 2009. This amended plan suspended the plan payment for the month of May 2009 and added a priority claim of the Internal Revenue Service. At a hearing on June 8, 2009, confirmation was continued on the condition that the Debtors remain current with plan payments for the purpose of filing amended schedules by June 30, 2009. On July 13, 2009, this second amended plan was confirmed by the Court. However, on August 13, 2009, the Trustee filed a certification that the case should be dismissed because the Debtors had failed to make plan payments in the time directed by the Court. On September 4, 2009, the case was dismissed by the Court and although a Motion to Vacate was filed on September 14, 2009, that Motion to Vacate was withdrawn on October 1, 2009. Less than a month after the Court's dismissal of the Debtors' second case, the present case was instituted on October 2, 2009.

III.  Statements of Counsel

In addition to the contentions made by the Trustee in the Motion itself, the Trustee expressed the following to the Court at the hearing on December 7, 2009: Although the Trustee noted that Mr. Taylor's testimony indicates that the Debtors will be able to make their required payments, the Trustee alleged that there is no evidence or showing of a change in circumstances to support the Debtors' contention. The Trustee stated that the Debtors never revealed additional income in their schedules received by performing casual labor but based on the income from social security alone, the Trustee contended that there will be a default if this case proceeds forward. The Trustee asserted that history supports her position. The Trustee noted that the Debtors have had two prior bankruptcies in which they defaulted on both mortgage and plan payments. The Trustee noted that the first case was dismissed for failure to

11

perform and the same pattern of missing payments led to subsequent dismissal of the second

case.  The Trustee alleged that the same pattern of behavior has already started in the present

case.  For that reason the Trustee contends that dismissal is warranted with prejudice.

Following the statements of the Trustee, counsel for the Debtors asked the Court

to rule that the test is a "change in circumstances."  Counsel stated that there is now an assured

level of income because the prior business issue has been resolved.  Counsel noted that an

additional grandchild[9] of the Debtors is now in their custody, resulting in additional income to

assist with household expenses.  Following up on those statements in court, the written analysis

provided by counsel for the Debtors in response to the Court's request likewise made similar

representations.  In the written analysis counsel noted that the Debtors received a combined

income of $1,908 in December 2009.  Additionally, counsel noted that Mr. Taylor's income

from the casual labor performed for the month of November was $150 and although not regular

or guaranteed, counsel noted that Mr. Taylor intends to pursue similar opportunities to receive

additional income in the future.  Counsel also noted in the analysis that the Debtors receive per

month a total of $972.94 for the care and expenses of their grandchildren from social security.

Additionally, counsel represented in the analysis that $674 which is paid to Mrs. Taylor monthly

for the benefit of her disabled brother will be contributed to the household expenses of the

Debtors.  Per this analysis the Debtors amended schedules I and J.  Schedule I reflects a

combined household income from these various sources of $3,629.94, which after subtracting

monthly expenditures on Schedule J of $3,074.93, leaves a monthly net income of $555.01.

--------

[9] According to the Court's review of the schedules filed in the Debtors' second case and those filed in the present one, between the time of the Debtors' second case and the present case the six year old boy began residing in the Debtors' household.

12

Based on this analysis, counsel represented to the Court that the Debtors have the means for

making both the Trustee payments and the mortgage payments.  Counsel noted that the funds are

received on the third of each month and that he will commit to monitor the Debtors' performance

under the plan and forward the necessary payments to the Trustee in a timely manner upon his

receipt of such funds from them.

IV.  The Court's Review of the Debtors' Income and Expenses

            As previously noted, the Debtors amended schedules I and J on December 17,

2009, following the hearing on December 7, 2009.  In their originally filed Schedule I the

Debtors had listed income from social security of $2,664.34.  In comparing both the original and

amended schedule, the Court has noted the following differences:  Although the primary income

listed is still social security, the Debtors added the additional source of income for Mr. Taylor's

casual labor of $75 per month.  Their social security income has also increased.  Mr. Taylor's

income from social security is listed at a higher amount of $882, an additional $49 per month.

Mrs. Taylor's income from social security is listed as $906, an additional $659 per month.

Amended Schedule I also includes $120 in "additional payment" from social security for Mrs.

Taylor.  The amount received for care of the Debtors' granddaughter is listed as $417, an

additional $170 per month.  The amount received for care of the Debtors' grandson is listed as

$555.94, a decrease of $67.40 per month.  The amount that Mrs. Taylor receives as

representative of her brother for social security disability is listed as $674, a decrease of $40.  As

referenced previously, the Debtors have represented to the Court that Mrs. Taylor's brother

contributes his social security payment to the expenses of the household.  Based on these

changes, the Debtors reported an additional $890.60 of social security income on amended

13

Schedule I as compared to the originally filed Schedule I in this case.  With the addition of Mr.

Taylor's casual labor income, the Debtors have reported a total of $965.60 per month in income

above what was originally reported, a rather astonishing variation considering that they were

filed little more than two months apart.

In comparing the originally filed and subsequently amended Schedule J in this

case, the Court finds that the Debtors originally listed their mortgage payment as $863, inclusive

of taxes but exclusive of insurance.  In the amended schedule the Debtors report the expense at

$882.60, inclusive of both taxes and insurance.  However, although these amounts appear to be

rather similar based on the inclusion of insurance for the expense listed in the subsequently

amended schedule, the Debtors represented to the Court in their proposed plan in this case that

the payment for their mortgage is $976.10 as the Court highlighted in footnote three of this

decision, an amount which is $93.50 higher than the amount listed in amended Schedule J.

Additional changes found from comparing the originally filed and subsequently amended

Schedule J include increases of $475 per month for food, $75 per month for clothing, $50 per

month for laundry/dry cleaning, $35 per month for medical/dental, $202 per month for

transportation, and $95 per month for recreation.  Based on these changes, the Debtors report in

amended Schedule J expenditures that are $961.10 higher than the amount originally reported in

this case.

Although the Debtors represented in their originally filed and subsequently

amended Schedules I and J that they have sufficient net disposable income to pay both their

mortgage obligation and the obligation proposed in their Chapter 13 plan, the Court finds that

this is not so based on the amount of the Debtors' mortgage payment represented in their

14

proposed plan.  After allowing for this increase, even if the remaining budget figures are

accepted as presented in the amended Schedules I and J, not enough net income remains to make

both the mortgage payment and the necessary plan payment.  Based on the Court's review, if the

Debtors expect to pay $976.10 per month to American Home Mortgage Servicing as provided in

the proposed plan, which mirrors the payment amount set forth in the latter's proof of claim, they

will be left with monthly net income of $461.51, an amount that is $88.49 short of the monthly

$550 payment they are to make to the Trustee.


## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28

U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District

Court on July 24, 1984.  Matters relating to confirmation of plans and case dismissal are "core"

bankruptcy proceedings pursuant to 28 U.S.C. § 157(b)(2)(L) and (A), respectively.

Certain specific grounds for dismissal of a chapter 13 case, by parties other than

the debtor, which are pertinent to the present case, are set forth in 11 U.S.C. §1307(c) and consist

of the following:

> (c) Except as provided in subsection (e) of this section, on request
> of a party in interest or the United States trustee and after notice and
> a hearing, the court may convert a case under this chapter to a case
> under chapter 7 of this title, or may dismiss a case under this chapter,
> whichever is in the best interests of creditors and the estate, for cause,
> including—
> (1) unreasonable delay by the debtor that is prejudicial to
> creditors; . . .
> (4) failure to commence making timely payments under
> section 1326 of this title;
> (5) denial of confirmation of a plan under section 1325 of this
> title and denial of a request made for additional time for filing

15

another plan or a modification of a plan[.]

It should be noted, however, that these grounds specifically provided for in the statute are not exclusive, but are representative of the type of actions or failure to act which constitute "cause" for conversion or dismissal of a case.  Many courts have held that a debtor's "bad faith" in filing a chapter 13 case can be "cause" for case dismissal or conversion, "whichever is in the best interests of creditors and the estate."  Judge Duncan of the Bankruptcy Court for the District of South Carolina has recently dealt with this very issue and has noted many of the appellate decisions so holding.  *See In re Smith*, 418 B.R. 160, 162-63 (Bankr. D.S.C. 2009).  As noted by Judge Duncan, many other lower court decisions to the same effect are collected in Appendix O of Judge Lundin's comprehensive treatise, *Chapter 13 Bankruptcy, 3d ed.* (2000 & Supp. 2006). Because neither "good faith" nor "bad faith" is defined in the Bankruptcy Code, however, it is considerably easier to conclude that bad faith constitutes cause for dismissal than it is to determine when such conduct has been established.  This Court agrees with Judge Duncan that the burden of proof rests upon the party seeking dismissal for cause to demonstrate that such cause exists and that merely a history of previous case filings is not sufficient to create a prima facie case of bad faith justifying dismissal of the case.  *See Smith, supra*, 418 B.R. at 165.  The *Smith* decision cites an earlier South Carolina Bankruptcy Court case, *In re McFadden*, 383 B.R. 386 (Bankr. D.S.C. 2008), as applying the following nonexclusive factors to determine bad faith in connection with a motion to dismiss:  "(1) debtor's past bankruptcy filings; (2) the period of time that has elapsed between debtor's prior case and the current case; (3) debtor's pre-petition behavior; and (4) the effect of Debtor's repeated filings on creditors."  *Smith*, 418 B.R. at 164, citing *McFadden*, 383 B.R. at 389.  Judge Duncan goes on to conclude that "[t]hese factors, and

16

indeed all of the circumstances, seem relevant to the consideration of dismissal for alleged bad

faith in filing a petition." 418 B.R. at 164. Particularly when prior case filings constitute a

substantial part of the proof of bad faith, this Court also agrees with counsel for the Debtors that

a change in circumstances can be powerful evidence that the current filing has been made in

good faith. Conversely, an absence of any material positive change in a debtor's financial

circumstances which doomed earlier chapter 13 case efforts is likewise powerful evidence that a

current case has not been filed with an objectively reasonable belief that the new case will be

successful in obtaining confirmation of, and then satisfactorily completing, a plan which, for

example, will cure a large filing date arrearage in the debtor's mortgage and otherwise resolve in

a manner appropriate to such debtor's financial circumstances his or her obligations to other

creditors.

   The troubling thing about the present case is that the preponderance of the

evidence supports a conclusion that any positive change in the Debtors' financial circumstances

occurred after they filed their most recent petition, not during the interim between the dismissal

of the preceding case and the filing of the new petition, a period of only twenty-eight days.

While the evidence before the Court does not prove that the Debtors' poor performance in their

two previous chapter 13 cases is attributable to anything other than a succession of health and

other personal misfortunes which have beset them, it is important because it establishes that the

Debtors knew based on their prior experience that if they did not pay both their plan payments to

the Trustee as well as their mortgage obligation, their case would not be successful and would be

dismissed. In short, their failure to pay either the Trustee or their mortgage lender during the

period between the date they filed their petition on October 2 and the date of the December 7

17

hearing cannot be said to be the result of ignorance on their part of their responsibilities in a chapter 13 case.

Although the evidence presented at the December 7 hearing did not establish all of the contentions made by the Trustee in her motion to dismiss, it did prove that the Debtors failed to commence making timely payments to the Trustee within thirty days of the issuance of the order of relief, which occurred on the filing date, as required by § 1307(c)(4) of the Code. Furthermore, the fact that the present case is their third Chapter 13 case within little more than a year demonstrates that their failure to do so is attributable to some cause other than simple ignorance on their part.  Accordingly, it is clear that the Trustee has established "cause" for dismissal or conversion even without a finding of "bad faith."   The Trustee seeks more than just dismissal, however; she asks for dismissal of the present case "with prejudice," a remedy which is expressly provided to bankruptcy courts by 11 U.S.C. § 349(a).  To dismiss a bankruptcy case "with prejudice" when used in its most precise sense means that the debtor can never obtain in any subsequent case a discharge of debts included in the case being dismissed.  In *Colonial Auto Center v. Tomlin (In re Tomlin)*, 105 F.3d 933 (4th Cir. 1997), Circuit Judge Motz discussed § 349(a) and stated:

> that § 349 was never intended to limit the bankruptcy court's ability to impose a permanent bar to discharge that would have res judicata effect.  Rather the language of § 349, as amended, 'seems to make clear that the court has the power to order' such a sanction 'in circumstances other than those dealt with by new § 109(g).'

*Id*. at 938 (citing Michael T. Andrew, *Real Property Transactions and the 1984 Bankruptcy Code Amendments*, 20 Real Prop. Prob. & Tr. J. 47, 72 n.107 (1985)).  To note what likely is already obvious, such a remedy is a harsh one.  For that reason the Court does not believe that it

18

is one which ought to be imposed unless the justification for doing so is clear, indeed that it be

almost undeniable.  The Trustee's own pleading, however, seems to reflect some ambivalence on

this point as it expressly seeks either dismissal with prejudice or conversion of the case to

Chapter 7.  Unless some creditor or other party in interest, such as the Chapter 7 Trustee or the

United States Trustee, were to file an adversary proceeding seeking to deny the Debtors a

discharge pursuant to 11 U.S.C. § 727, the Debtors would presumably receive a discharge of

their legal liability upon their debts in the current case if it were converted to Chapter 7.  Such a

result would be at odds with the alternative relief of dismissal with prejudice, which would

preclude the Debtors from later filing a petition under Chapter 7 and obtaining a discharge of

their current debts.  The *Tomlin* opinion also noted, however, "that it has become common

bankruptcy practice to employ the phrase 'dismissed with prejudice' to refer to a temporary bar

to filing another petition."  105 F.3d at 938.  The Court went on to hold that "the term 'dismissal

with prejudice' in bankruptcy cases can either permanently bar discharge of certain debts or it

can trigger the bar to filing successive petitions under § 109(g)."  *Id. at 939.*

What has become more commonplace in popular culture than the search for "the

smoking gun" to furnish nearly incontrovertible evidence of the existence of some fact,

especially personal responsibility for the occurrence of some event?  In attempting to determine

whether the Debtors have exhibited "bad faith" in the filing of their current case, the "smoking

gun" might be said to be their failure after filing their petition to make any payment to the

Trustee or to their mortgage lender between the filing date of October 2 and the hearing date of

December 7 on the Trustee's motion to dismiss[10] their case.  According to Mr. Taylor's own

---

[10] The Trustee's motion was filed on November 16, 2009.

19

testimony, at the time they filed their current case they did not have the income then to be able to make the payments they needed to make to the Trustee and the mortgagee and still cover their living expenses.  While the Court concludes that they did not file their petition under Chapter 13 in good faith, that does not necessarily mean that they had a conscious intent to injure their creditors or to abuse the bankruptcy system.  After all, their home was on the line and a desperate situation might cause anyone to take desperate measures.  A drowning man who realizes that he is going under for the third and last time is likely to try and grab hold of anything which might possibly help him keep his head above water.

What then does "bad faith" consist of in a case having the facts presented in this one?  In its most benign form I suggest that it involves filing a Chapter 13 petition for the purpose of retaining encumbered property, even assuming a sincere desire and optimistic hope to be able to do so, but without the present financial means to propose a confirmable plan which is reasonably likely to be performed and completed successfully.  For example, a case which is commenced premised on the hope that the funds necessary to proceed successfully will materialize by virtue of a winning lottery ticket yet to be obtained or an unrealized possibility of inheritance is not one which is filed in good faith no matter how sincerely the debtor may want to pay his creditors their due.  The proof that the Debtors did not file their petition and plan in good faith lies in Mr. Taylor's admission that he and his wife did not make the November payments expected of them because their incomes had not increased to the level necessary to permit them to do that.  Their failure to pay either their November mortgage payment or Trustee payment, in the absence of any claim such as loss of funds or necessary unanticipated emergency expenditure offered to excuse or at least explain their payment failure, demonstrates their lack of

20

actual intent to make such payments when they filed their petition on October 2nd and their plan

on October 19th.  The Debtors' amended Schedule J, which contains a doubling of their

indicated household food expense from the original figure, casts strong doubt about the

seriousness with which they compiled their original schedules which represented that they had

the disposable income to pay what the case required of them.

   The conclusion that cause for dismissal of this case exists is considerably easier to

arrive at than what is the appropriate response by the Court to such fact.  There appears to be no

non-exempt realizable equity in the Debtors' property which would hold forth any reasonable

expectation that a conversion of the case to Chapter 7 would yield any actual recovery for the

Taylors' unsecured creditors.  Similarly, the fact that virtually all of their current and future

income is composed of social security income exempt from the claims of their creditors makes

the chances of any successful collection efforts against them should this case be dismissed,

barring some very unlikely great turn of fortune such as a winning lottery ticket, seem closer to

none than the proverbial "slim."  The Court sees no basis in the evidence before it to deny the

Debtors the right to Chapter 7 relief.  It does see a basis for denying them any right to relief

under Chapter 13 with respect to their existing mortgage indebtedness and therefore to rule that

any future efforts by them to cure their existing default or a modification of the amount or other

terms of such indebtedness will depend on the voluntary agreement of the parties or other non-

bankruptcy alternatives which may be available to them.  Accordingly, by a separate order to be

entered contemporaneously herewith, this case will be dismissed with a restriction upon filing

any new Chapter 13 case in any bankruptcy court for a period of twelve months hence and

permanently with respect to any such case proposing to deal with their existing mortgage

indebtedness, but this order shall be stayed for a period of fourteen days to permit them to file a

motion to convert this case to Chapter 7, in which event such conversion shall be ordered

forthwith but the indicated restrictions upon refiling a new petition under Chapter 13 shall

continue to be applicable and in full force and effect.

    The Court, frankly, has struggled with the proper resolution of this case.  It is

quite conscious of the fact that the Debtors have assumed the responsibility for the care of their

two grandchildren and Mrs. Taylor's disabled brother, all of whom live in their home.  The

Court takes no pleasure in its ruling and has no feeling of ill will to Mr. and Mrs. Taylor.  Indeed

it wishes them well in their efforts to hold their household together.  It also believes that the best

interests of both the Debtors and their mortgage lender will be served by such parties voluntarily

reaching some modification of the mortgage indebtedness as may enable them to save their home

while still returning to the mortgagee most of what it can rightfully claim, but is unlikely actually

to recover in a foreclosure of its lien upon such home.  The Court also hopes that the Taylors and

their automobile lender may be able to reach some accommodation between them, perhaps in the

nature of a negotiated reaffirmation agreement to a modified obligation, which takes into account

the actual liquidation value of such vehicle and the almost certain loss to the creditor should no

such agreement be reached.  The Court has no authority, in light of its ruling, to compel the

secured creditors to act or refrain from acting, but it does request them to evaluate both the

reasonably likely financial consequences to themselves upon liquidation of their collateral and

the real life consequences to the Debtors and their dependents resulting from such a liquidation.

In summary, the Court simply suggests that the best interests of all parties concerned may be

served by good faith negotiation recognizing the financial realities in which they find

themselves, followed by the Taylors' meticulous performance of any agreements so reached.

Decided this 13th  day of January, 2010.


UNITED STATES BANKRUPTCY JUDGE